NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200009-U

NOS. 4-20-0009, 4-20-0047 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 4, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| HARRIS SILVER, Individually and Derivatively on Behalf of IESO, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of Sangamon County |
| Plaintiff-Appellant, | ) | No. 18CH350 |
| v. | ) | |
| JEAN-PAUL ST. GERMAIN; GRANT JONES; GTS FARMS, INC.; THOMAS JENNINGS; TIM BICKETT; BRIAN AAMOTH; BRYAN COBIN; THEODORE COHN; BILL COLON; NATREL, LLC; ROY GOTTLIEB as Trustee of the ROY GOTTLIEB REVOCABLE TRUST; BURL GRIFFITH; JEL, LLC; PAUL JOHNSON; JESSICA KUBOW; ESTATE OF TOM McNAMARA; OBIECO DEVELOPMENT, LLC; AMI RUFFING; MARCOS SANCHEZ; BARBARA BAUGH; and IESO, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Ryan M. Cadagin, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Plaintiff failed to present both a sufficient record and a sufficient argument with respect to his claims that the trial court abused its discretion by staying his motion to compel discovery and denying his motions to strike defendants' summary judgment motions as unsupported.

(2) The trial court erred by granting defendants' motions for summary judgment as to counts I, II, III, and V of plaintiff's second amended complaint on the basis that,

as a matter of law, debt-to-equity conversions challenged by plaintiff were authorized by the defendant company's Operating Agreement.

(3) The trial court committed no error in granting summary judgment in defendants' favor as to count I of plaintiff's second amended complaint on the alternative bases that plaintiff's claims were either moot or "unspecified" and "vague."

(4) The trial court did not err in finding count IV of plaintiff's complaint, seeking rescission of an uncompleted and abandoned transaction was moot and granting summary judgment in defendants' favor on that basis; however, the court did err in finding claims plaintiff raised in count IV, seeking rescission of a "convertible note" were moot and granting summary judgment in defendants' favor where a genuine issue of material facts existed as to the contents and provisions of the note.

(5) The trial court erred in granting summary judgment in defendants' favor as to count V of plaintiff's second amended complaint on the alternative basis of plaintiff's failure to allege facts to support the element of damages.

¶ 2       Plaintiff, Harris Silver, brought suit against defendants—IESO, LLC, an Illinois Limited Liability Company (IESO) of which he was a member, and IESO managers and/or members Jean-Paul St. Germain; Grant Jones; GTS Farms, Inc. (GTS Farms); Thomas Jennings; Tim Bickett; Brian Aamoth; Bryan Cobin; Theodore Cohn; Bill Colon; Natrel, LLC; Roy Gottlieb as Trustee of the Roy Gottlieb Revocable Trust (Gottlieb Trust); Burl Griffith; JEL, LLC (JEL); Paul Johnson; Jessica Kubow; the Estate of Tom McNamara (McNamara Estate); Obieco Development, LLC (Obieco); Ami Ruffing; Marcos Sanchez; and Barbara Baugh—alleging actions were taken by the defendant members and managers on IESO's behalf in violation of

Operating Agreement and which improperly diluted plaintiff's interest in the company. The trial court granted summary judgment in defendants' favor as to several of the counts raised by plaintiff in his second amended complaint and he appeals. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4         According to the pleadings, IESO was formed in August 2014 for the purpose of becoming licensed in Illinois to operate as a medical cannabis grower. In February and March 2015, IESO obtained the necessary license and permit to operate a medical cannabis cultivation center in this State.

¶ 5         In October 2018, plaintiff initiated the underlying action for injunctive, declaratory, and other relief, alleging defendants improperly allowed a "conversion" of the debts IESO owed to its members into equity in the company, resulting in the dilution of plaintiff's interest, and seeking to stop a transaction between IESO and another entity, Sea Hunter Holdings, LLC (Sea Hunter). Plaintiff initially included Sea Hunter, its subsidiaries, and other entities allegedly in "privity of contract" with Sea Hunter and with an alleged interest in the IESO transaction as named defendants in his cause of action; however, in November 2018, IESO's agreement with Sea Hunter terminated and each of those entities was dismissed from the case.

¶ 6         In January 2019, plaintiff filed the six count "Second Amended Verified Complaint For Injunctive And Declaratory Relief," which is at issue on appeal. He alleged he was a founding member and former manager of IESO. Upon IESO's formation, he agreed with defendant St. Germain to work to obtain IESO's Illinois license as a medical cannabis grower while St. Germain agreed to fund IESO's application process and its operating expenses.

- 3 -

¶ 7    On September 1, 2014, IESO's operating agreement became effective. Plaintiff attached a copy of that agreement to his second amended complaint. Section 4.1 of the operating agreement provided for three managers of the company who, except as otherwise provided by the agreement or non-waivable provisions of the Limited Liability Company Act (Act) (805 ILCS 180/1-5 *et seq.* (West 2012)), had "full and complete authority, power, and discretion to direct, manage, and control the business, affairs, and properties of [IESO], to make all decisions regarding those matters[,] and to perform any and all other acts or activities customary or incident to the management of [IESO's] business." Under section 4.3, the managers' "General Powers" included the power to borrow money; execute agreements and contracts; and "[t]ake, or refrain from taking, all actions not expressly proscribed or limited by the [operating agreement] ***."

¶ 8    Under the operating agreement, "Units" were defined as "the measure of an Interest Holder's ownership in the Company issued by the Company to its Members in exchange for a Capital Contribution to the Company." A "Capital Contribution" was defined to "mean any contribution to the capital of the Company in cash or property by a Member whenever made." Plaintiff alleged that when IESO was formed, it issued 1,200,000 units. He was issued 258,000 of those units, giving him a 21.5% interest in IESO.

¶ 9    Relevant to this appeal, IESO's operating agreement also had specific provisions relating to loans and the issuance of additional units. Specifically, section 4.14 of the agreement, entitled "Loans to Company," stated as follows:

> "The Manager or any Member, with the consent of the Manager, may lend or advance money to the Company. If the Manager or any Member makes a loan or loans to the Company or advances money on Company's behalf, the amount of any

- 4 -

such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company. The amount of any such loan or advance shall be repayable out of the Company's cash and the rate of interest and the terms and conditions of such loan shall be no less favorable to the Company than if the lender had been an independent third party. The Manager and any Member are under no obligation to make any loan or advance to the Company."

Section 8.2, entitled "Additional Capital Contributions; Additional Units," further provided as follows:

"No Interest Holder shall be obligated to make any additional Capital Contributions to the Company or to pay any assessment to the Company, other than any unpaid amounts on such Interest Holder's original Capital Contributions, and no Units shall be subject to any calls, requests, or demands for capital. Additional Membership Interests quantified by additional Units may be issued in consideration of Capital Contributions as agreed to between the Manager and the Person acquiring the Membership Interest. Each Person to whom additional Units are issued shall be admitted as a Member in accordance with this Agreement."

¶ 10        Plaintiff alleged that after IESO obtained the necessary permit and license to operate in Illinois in 2015, it needed additional funding to build and operate its facility. Beginning in June 2015, it sought additional investors by offering to sell $7,200,000 of subordinated debentures along with the right to purchase units of membership in the company for $1 per unit. Ultimately, IESO raised $7,470,000 from eight investors and issued 830,000 additional units in exchange for $830,000. By October 2015, plaintiff, who had purchased additional units, then held

a total of 282,000 units, resulting in a 13.9% interest in IESO. St. Germain held 1,053,833 units, resulting in a 51.92% interest in the company.

¶ 11        Plaintiff alleged that after IESO became licensed, he was "shut out" of the operation of the company, he was removed as one of IESO's managers, and IESO was mismanaged by individuals "appointed" or "installed" into manager positions by St. Germain. He asserted that in 2015, IESO sold $0 worth of product and, in 2016 and 2017, its financial statements showed it operated at a loss. During those time frames, St. Germain issued loans to IESO for its continued operations.

¶ 12        According to plaintiff, "prior to June 2017, St. Germain decided to launch a scheme whereby he would convert [debt owed to him by IESO] to equity and then position IESO for sale and new management." On June 7, 2017, a meeting was conducted with IESO members, including plaintiff, to discuss IESO's financial statements and "[t]o consider and vote on a plan to restructure the Company to obtain debt relief and the funds necessary to continue operations through the end of the year ***." The plan was described as having the following elements:

"a.     Conversion of the outstanding principal ($7,470,000) and accrued interest ($358,913) of the Subordinated Debentures through May 31, 2017, to Units of Membership Interest in the Company on a $1 per Unit basis;

b.     Conversion of the outstanding principal and accrued interest on the Company's short-term debt (approximately $5.9 million as of April 30, 2017) to Units of Membership Interest in the Company on a $1 per Unit basis; and

c.     Sale of 2 million additional Units of Membership Interest in the Company

- 6 -

to existing Members for $1 per Unit with the proceeds from the sale used to provide the capital believed to be necessary to fund the Company's continued operations until the end of the year."

¶ 13    Plaintiff alleged "the vast majority of debt to be converted" pursuant to the plan "was held by St. Germain and GTS Farms." During the June 2017 meeting, the plan was adopted with members holding 81.97% of IESO's membership interests voting in its favor. Plaintiff objected to the plan and voted against its adoption, asserting (1) the debt instruments had never been produced to IESO's members; (2) the debt instruments did not provide for the conversion of debt to equity; and (3) the plan violated, and was implemented in violation of, several provisions of IESO's Operating Agreement. Additionally, he alleged that several member defendants "engaged in self-dealing transactions and participated in voting on the same, in violation of their fiduciary duties and in breach of conflict of interest provisions of [IESO's] Operating Agreement ***."

¶ 14    Prior to IESO's implementation of the plan, it had issued 2,030,000 units of membership. Upon implementation, principal and interest on both the subordinated debentures ($7,470,000 + $381,946 = $7,851,946) and IESO's short-term debt ($5,941,639)—debts totaling $13,793,585—was repaid through the issuance of 13,793,585 units of membership interest in IESO at a rate of $1 per unit. Additionally, IESO offered to sell $2 million of additional units for $1 per unit. Accordingly, after the plan was implemented, over 15 million units of membership were added by IESO. St. Germain's interest in IESO increased to 73.58% and plaintiff's interest in IESO ultimately decreased to 1.68%.

¶ 15    Plaintiff next alleged that in March 2018, defendants "tried to fashion the sale of

all IESO equity to Sea Hunter ***." Under the proposed sale, IESO shares would be "swap[ped]" for Sea Hunter shares. Plaintiff objected to the transaction and it was ultimately abandoned.

¶ 16        According to plaintiff, in August 2018, defendants "retooled" the Sea Hunter transaction and "disguised" it as a "merger." They presented a proposal for an "Agreement and Plan of Merger" with Sea Hunter and its subsidiaries. Plaintiff asserted the "operable part of the transaction [was] that the equity interests in IESO [were to be] swapped for [Sea Hunter] equity." During a meeting on August 24, 2018, IESO members held a vote and approved the merger. Again, plaintiff objected. He alleged the proposed Sea Hunter merger transaction was fundamentally flawed because it was not actually a merger between IESO and Sea Hunter and because IESO managers lacked "authority under the Operating Agreement or otherwise to sign and approve a merger." Plaintiff asserted IESO's Operating Agreement required unanimous consent by IESO members to the Sea Hunter transaction, which defendants did not have. Plaintiff acknowledged that in November 2018, after he initiated the underlying action, Sea Hunter gave notice that they were terminating the proposed merger transaction.

¶ 17        Plaintiff also alleged that in retaliation for his attempts to assert his rights in IESO, defendants conspired to declare that he was no longer a member of the company. He asserted that on November 14, 2018, IESO managers sent him a letter, informing him that his pending dissolution of marriage proceedings constituted an "Involuntary Withdrawal" event under IESO's Operating Agreement, which made plaintiff no longer an IESO member but, instead, an "Economic Interest Owner" with no right to participate in the management of IESO. Plaintiff maintained, however, that "nowhere in the Operating Agreement does an Involuntary Withdrawal cause an automatic forfeiture of any Member's rights." According to plaintiff, defendants also

improperly amended the Operating Agreement at a special meeting on November 21, 2018, to remove unanimous membership approval of any IESO equity transaction.

¶ 18 In count I of his second amended complaint, plaintiff sought injunctive relief against "[t]he IESO Defendants and Persons Acting in Concert." He identified "[t]he IESO Defendants" as St. Germain, GTS Farms, and IESO's managers—Jones, Bickett, and Jennings. Plaintiff asserted he sought injunctive relief "to stop the unlawful acquisition of equity interests of IESO by Sea Hunter or any other third party absent unanimous consent of" IESO's members. He specifically asked the trial court to enter an order enjoining (1) "any actions taken toward the closing, completion or implementation or operation of the [Sea Hunter merger transaction] or other transaction seeking to transfer IESO's business, assets or membership interests to a third party"; (2) the conversion of any debt to equity or "maintaining percentages of ownership on the books and records of IESO reflecting the [d]ilution percentages or any percentages of ownership other than *** where [plaintiff] owns 13.9% of all equity or value of IESO"; (3) business or transactions involving IESO or its members based upon the alleged improper dilution of membership interests, including the dilution of plaintiff's 13.9% interest; (4) business or transactions of IESO "which fails to provide Notice to [plaintiff] or any other rights accorded a Member of IESO"; (5) use of an Operating Agreement in any form other than prior to November 2018; and (6) any transaction unless and until IESO managers provide access and copies of records as required by the Act.

¶ 19 In count II, plaintiff sought declaratory relief against all named defendants, asserting defendants improperly permitted the conversion of IESO's debt to equity in June 2017, resulting in the dilution of his and other IESO members' interests. He specifically sought declarations from the trial court that (1) members' interests in IESO were "as before the

[d]ilution"; (2) actions taken by IESO at the June 7, 2017, meeting were null and void; (3) the August 2018 merger agreement with Sea Hunter was invalid and unenforceable; (4) actions taken by IESO at the August 24, 2018, meeting were null and void; (5) certificates or units of IESO issued on or after June 2, 2017, in connection with the debt conversion and dilution were null and void, (6) actions taken at the November 21, 2018, special meeting were null and void; (7) the IESO managers' November 14, 2018, letter to plaintiff was null and void; and (8) any debt instrument allowing for the conversion of debt to equity was unauthorized and null and void.

¶ 20     In count III, plaintiff raised breach of fiduciary duty claims against St. Germain and IESO's managers—defendants Bickett, Jennings, and Jones. He alleged those defendants breached their duties of loyalty, care, and good faith and fair dealing owed to IESO in connection with the June 2017 debt-to-equity conversion and the Sea Hunter merger transaction. Plaintiff sought relief, including an award of individual damages, an award of damages to IESO, punitive damages, and costs and attorney fees.

¶ 21     In count IV, brought against all defendants, plaintiff sought rescission of the merger agreement with Sea Hunter and a "2015 Convertible Note" issued to St. Germain, which he alleged provided that the principal amount owed was convertible to equity in the company at the option of the holder. Plaintiff asked for relief, including a judgment in his favor and against defendants that (1) the merger agreement "or any such similar undisclosed transaction which attempts to transfer IESO's business, assets[,] or membership interests without unanimous consent of IESO members or" that violates "the Operating Agreement and the Act is effectively rescinded and null and void"; and (2) the 2015 convertible note "and any other convertible debt instruments be effectively rescinded and null and void or such portions of such instruments as provide any right to convert

- 10 -

into equity of IESO by any party be rescinded or reformed."

¶ 22    In count V, plaintiff alleged a breach of IESO's Operating Agreement by its "Approving Members and Managers," specifically naming St. Germain, Jones, GTS Farms, Aamoth, Cobin, Colon, Griffith, JEL, Johnson, Kubow, the McNamara Estate, Natrel, Obeico, and Ruffing. He sought an award of damages, costs, and attorney fees.

¶ 23    Finally, in count VI, brought against the "IESO Defendants," plaintiff alleged a violation of defendants' statutory duties to provide books and records. He sought relief including damages and an order compelling IESO and its managers to allow full access to the documents and information he sought.

¶ 24    In April 2019, IESO's manager defendants—Jones, Jennings, and Bickett—filed a motion for summary judgment as to counts II, III, IV, and V of plaintiff's second amended complaint. The same month, IESO filed a motion for summary judgment as to all counts. In July 2019, member defendants—Ruffing, Colon, Aamoth, Obieco, Johnson, JEL, Cobin, Griffith, the McNamara Estate, Kubow, and GTS Farms—filed a motion for summary judgment as to all counts. In September 2019, St. Germain made an oral request to join the pending motions for summary judgment. Finally, in December 2019, defendants Roy Gottlieb, as Trustee of the Roy Gottlieb Revocable Trust, and Natrell also moved for summary judgment on counts II, IV, and V of plaintiffs second amended complaint. All defendants essentially maintained that a question of law was presented regarding what actions by IESO's members and managers were authorized by its Operating Agreement and that the issuance of units to IESO's creditor members in exchange for their release of IESO's outstanding indebtedness was permitted. Additionally, defendants maintained that issues related to the Sea Hunter merger transaction were moot.

¶ 25    In June 2019, plaintiff filed a "Motion To Compel Production" from IESO and its manager defendants, alleging he had served written requests for production upon those defendants, but they failed to respond. He argued such discovery was necessary to respond to defendants' motions for summary judgment. Plaintiff also filed a motion to strike IESO's and the manager defendants' motions for summary judgment as procedurally defective and unsupported. Alternatively, he asked to stay summary judgment proceedings pending discovery.

¶ 26    In September 2019, the trial court conducted a hearing on plaintiff's pending motions. The appellate record does not contain a transcript of that hearing; however, the court's docket entry reflects plaintiff's motions to strike or, alternatively, stay summary judgment proceedings were argued and denied. It additionally shows the court heard argument on plaintiff's motion to compel and ordered that "[m]otion stayed pending [the] outcome of Defendants' Motions for Summary Judgment."

¶ 27    In October 2019, the trial court conducted a hearing and heard arguments relative to the pending motions for summary judgment. On December 6, 2019, the court entered a written order granting the motions of IESO and the manager and member defendants with respect to counts I through V of plaintiff's second amended complaint. It first found that as a matter of law, the manager defendants had authority under the Operating Agreement to issue the challenged units and, thus, plaintiff could not prevail on Counts I, II, III, and V, which it determined were based on his challenge to the issuance of those units. The court further found that plaintiff's requests in count I for injunctive relief were either moot as they concerned enjoining the terminated Sea Hunter merger transaction or "overbroad and vague" as they related to enjoining "any agreement regarding the property or interests of IESO ***." Additionally, it found plaintiff's claims in count

- 12 -

IV were moot and his claims in count V failed to allege facts to support the element of damages.

¶ 28      On December 10, 2019, the trial court entered a written order granting "St. Germain's oral [m]otion for [s]ummary [j]udgment" for the same reasons set forth in its previous order. Finally, on January 9, 2020, the court entered a written order granting the motion for summary judgment filed by the Gottlieb Trust and Natrel as to counts II, IV, and V. Again, it relied on the rationale set forth in its December 6, 2019, written order.

¶ 29      Plaintiff separately appealed both the trial court's December 2019 orders and its January 2020 order. His appeals were consolidated for purposes of review.

¶ 30                              II. ANALYSIS

¶ 31      On appeal, plaintiff argues the trial court erred by granting summary judgment in the defendants' favor. He asserts (1) IESO's Operating Agreement expressly prohibited treating member loans as capital contributions as a matter of law; (2) the court erred in finding claims he raised were moot; (3) defendants' motions for summary judgment were not properly supported and he was improperly denied discovery regarding material issues of fact; and (4) genuine issues of material fact precluded the entry of summary judgment in defendants' favor.

¶ 32                          A. Standard of Review

¶ 33      "Summary judgment is appropriate 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Wingert v. Hradisky*, 2019 IL 123201, ¶ 42, 131 N.E.3d 535 (quoting 735 ILCS 5/2-1005(c) (West 2016)). "Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt." (Internal quotation marks omitted.) *Beaman v.*

- 13 -

*Freesmeyer*, 2019 IL 122654, ¶ 22, 131 N.E.3d 488. "[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." (Internal quotation marks omitted.) *Id.*

¶ 34    "In ruling on a motion for summary judgment, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Id.* On appeal, the trial court's summary judgment ruling is subject to *de novo* review. *Id.*

¶ 35    Additionally, the Act provides that "members of a limited liability company may enter into an operating agreement to regulate the affairs of the company and the conduct of its business and to govern relations among the members, managers, and company." 805 ILCS 180/15-5(a) (West 2018). "[G]enerally, an LLC operating agreement is to be enforced according to general contract principles, unless it conflicts with a statute." *In re Marriage of Schlichting*, 2014 IL App (2d) 140158, ¶ 63, 19 N.E.3d 1055. "In construing a contract, the primary goal is to ascertain and give effect to the intention of the parties at the time the contract was formed." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 77, 51 N.E.3d 753.

¶ 36    "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). "Where no ambiguity exists, the intent of the parties at the time the contract was entered into must be ascertained from the language of the contract itself." *Matthews*, 2016 IL 117638, ¶ 77. However, when contract language "is susceptible to more than one meaning, it is ambiguous." *Thompson*, 241 Ill. 2d at 441. "If the contract language is ambiguous, a court can consider extrinsic

evidence to determine the parties' intent." *Id.*

¶ 37 Further, "[a] contract must be construed as a whole, viewing particular terms or provisions in the context of the entire agreement." *Matthews*, 2016 IL 117638, ¶ 77. Ultimately, the construction of a contract presents a question of law and is also subject to *de novo* review. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219, 874 N.E.2d 43, 50 (2007).

¶ 38 B. Plaintiff's Motions to Compel Discovery and
Strike Defendants' Summary Judgment Motions as Unsupported

¶ 39 Initially, we address plaintiff's assertion that the trial court abused its discretion by "stay[ing]" his motion to compel discovery and denying his motions to strike defendants' summary judgment motions as being insufficiently supported. Plaintiff argues discovery was necessary to respond to defendants' summary judgment claims that the debt-to-equity conversion was proper, that St. Germain's loans to IESO were justified, and that challenged transactions "aligned with the best interests of [IESO] ***." Further, he claims defendants' summary judgment motions were insufficiently supported with respect to assertions of fairness and insolvency and the terms of debts IESO owed.

¶ 40 On appeal, defendants respond by arguing the trial court's decision to stay or deny plaintiff's motions must be affirmed because plaintiff failed to provide a sufficient record upon which to review the trial court's decision and presents only conclusory arguments. We agree.

¶ 41 An appellant "has the burden of providing a sufficiently complete record to allow meaningful review of the issues on appeal." *Pekin Insurance Co. v. Campbell*, 2015 IL App (4th) 140955, ¶ 26, 44 N.E.3d 1103 (citing *In re Marriage of Gulla*, 234 Ill. 2d 414, 422, 917 N.E.2d 392, 397 (2009)). Further, "[a] reviewing court cannot review a trial court's factual findings or basis for its legal conclusion without a record of the proceeding." *Id.* "Any doubt arising from the

- 15 -

incompleteness of the record must be resolved against the appellant" and "[i]n the absence of an adequate record, we 'must presume the [trial] court's order had a sufficient factual basis and that it conforms with the law.' " *Id.* (quoting *Gulla*, 234 Ill. 2d at 422).

¶ 42    Additionally, an appellant's brief must have an "Argument" section, "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719, 495 N.E.2d 1132, 1137 (1986). "The appellate court is not a depository in which the appellant may dump the burden of argument and research." *Id.*

¶ 43    Here, as noted by defendants, plaintiff failed to include within the appellate record a transcript of the hearing during which the trial court heard arguments on his motions and entered its rulings. He also presents no bystander's report of that proceeding, nor has he challenged defendants' suggestion on appeal that, during that hearing, the court set forth relevant factual findings regarding its decisions. Further, plaintiff's arguments on appeal are conclusory and provide no discussion or legal analysis related to defendants' rationale for opposing his motions, the arguments presented to the court by the parties, or any of the court's factual findings. We note that, at the very least, the court's December 6, 2019, summary judgment order reflects factual findings relevant to plaintiff's motion, which he does not discuss or meaningfully challenge:

> "All facts relevant to the determination of whether the Managers had the authority to issue the Subject Units have been established by the verified allegations of the Plaintiff's Complaint and the exhibits appended thereto which constitute a part of

that pleading with all facts stated in said exhibits being considered the same as having been alleged in the Plaintiff's Verified Complaint. [Citation.] The verified allegations of facts and the facts established by the exhibits to the Plaintiff's Complaint are judicial admissions eliminating the need for further proof of said facts. [Citation.]"

¶ 44 We find plaintiff failed to present both a sufficient record to support his contentions on appeal and a proper argument as to the issues raised. Accordingly, we presume the trial court's rulings on his motions were correct.

¶ 45 C. Member Loans as Capital Contributions

¶ 46 On appeal, plaintiff argues the "conversion" of member debt to equity through the issuance of membership units, resulting in a dilution of some members' interests, violated IESO's Operating Agreement because it treated member loans as capital contributions. He argues such action was expressly prohibited by section 4.14 of IESO's Operating Agreement, entitled "Loans to Company" and which states as follows:

"The Manager or any Member, with the consent of the Manager, may lend or advance money to the Company. If the Manager or any Member makes a loan or loans to the Company or advances money on Company's behalf, *the amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company*. The amount of any such loan or advance shall be repayable out of the Company's cash and the rate of interest and the terms and conditions of such loan shall be no less favorable to the Company than if the lender had been an independent third party. The Manager and any

Member are under no obligation to make any loan or advance to the Company."

(Emphasis added.)

Plaintiff maintains the language of section 4.14 is clear and unambiguous in that it prohibits, without exception, treating loans or advances from IESO's members or managers as contributions to the capital of the company. Referencing section 4.4(A) of the Operating Agreement, plaintiff further argues that for a manager to "do any act in contravention of" the Operating Agreement, "unanimous consent of" IESO's members was required, which the managers did not have for the challenged debt-to-equity conversion.

¶ 47    Here, it is undisputed that following a June 2017 meeting, debts IESO owed to its members were converted to units of membership interest in the company, resulting in the dilution of some members' interests, including plaintiff's. Clearly, under the plain language of section 4.14 of the Operating Agreement, IESO members or managers "may lend or advance money to" IESO and, if that occurs, the loan or advance must be considered "a debt due" from IESO and not "treated as a contribution to the capital of the Company." Section 4.14's prohibition against treating a member loan as a capital contribution contains no qualification or exception permitting a change in a loan's treatment at some later date.

¶ 48    Nevertheless, defendants argue section 4.14 must be read in concert with other provisions of the Operating Agreement. They assert that the member loans at issue were initially "treated as loans" consistent with section 4.14 but later properly discharged following "a separate and mutual agreement *** to issue membership units to repay the debt," which was consistent with section 8.2 of the Operating Agreement. Section 8.2, entitled "Additional Capital Contributions; Additional Units," provides that while interest holders in IESO are not obligated to

- 18 -

make additional capital contributions to the company, managers may issue additional IESO membership units "in consideration of Capital Contributions \*\*\*." Specifically, section 8.2 states as follows:

> "No Interest Holder shall be obligated to make any additional Capital Contributions to the Company or to pay any assessment to the Company, other than any unpaid amounts on such Interest Holder's original Capital Contributions, and no Units shall be subject to any calls, requests, or demands for capital. *Additional Membership Interests quantified by additional Units may be issued in consideration of Capital Contributions as agreed to between the Manager and the Person acquiring the Membership Interest.* Each Person to whom additional Units are issued shall be admitted as a Member in accordance with this Agreement." (Emphasis added.)

According to defendants, section 8.2 permitted IESO's managers to issue membership units in exchange for capital contributions that were "in the form of a release of debt to the company."

¶ 49        We find defendants' assertions are contrary to the plain and unambiguous language of the Operating Agreement. First, section 4.14, itself, states that member loans "*shall* be repayable out of the Company's *cash*." (Emphases added.) As argued by plaintiff, courts generally "interpret the word 'may' as permissive and 'shall' as mandatory in private contracts." *Flanigan v. Board of Trustees of the University of Illinois at Chicago*, 2018 IL App (1st) 170815, ¶ 30, 128 N.E.3d 327 (quoting *Professional Executive Center v. LaSalle National Bank*, 211 Ill. App. 3d 368, 379, 570 N.E.2d 366, 373 (1991)). Further, the word "cash," when given its plain and ordinary meaning, does not include the release of a debt. See Black's Law Dictionary (11th ed. 2019) (defining "cash"

- 19 -

as "[m]oney or its equivalent" and "[c]urrency or coins, negotiable checks, and balances in bank accounts.").

¶ 50 Second, section 8.2 provides for the issuance of additional units in consideration of only "Capital Contributions." As argued by plaintiff, Section 1.1(G) of the Operating Agreement defines that term as follows: " 'Capital Contribution' shall mean any contribution to the capital of the Company *in cash or property* by a Member whenever made." (Emphasis added.) Here, additional units were issued in consideration of the release of a debt, which is not cash or property. See *id.* (defining "property" as "the rights in a valued resource such as land, chattel, or an intangible" and stating "[i]t is common to describe property as a 'bundle of rights,' " which "include the right to possess and use, the right to exclude, and the right to transfer"). Accordingly, the challenged units were not issued in exchange for a "Capital Contribution" as contemplated and required by IESO's Operating Agreement.

¶ 51 We note that, on appeal, defendants argue plaintiff forfeited any challenge to the issued units based on the Operating Agreement's "Capital Contribution" definition, asserting he did not raise that specific argument with the trial court. See *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 38, 123 N.E.3d 1271 ("Issues not raised before the trial court are deemed forfeited and may not be raised for the first time on appeal."). However, the record reflects plaintiff cited the Operating Agreement's definition of "Capital Contribution" in his response to defendants' motions for summary judgment and argued defendants improperly treated "loans as capital contributions." Further, he argued to the trial court that taking "loans off of [a company's] books" was not a capital contribution and IESO's agreement "says you can't do that. There's no new cash coming in and there's no new capital contribution." Under these

circumstances, we decline to apply forfeiture and find the argument was sufficiently preserved.

¶ 52        Third, on appeal, plaintiff additionally argues defendants' interpretation of section 8.2, which was accepted by the trial court, conflicts with section 4.4(G) of the Operating Agreement. Pursuant to that section, IESO managers may not "[a]dopt any plan of recapitalization" of the company "unless such action is approved or authorized by the Members owning [75%] of all the Members Voting Interest." Plaintiff contends the approval of a plan to issue over 15 million additional units of membership in June 2017 constituted a "recapitalization." Further, he argues that although the plan was voted on and approved during the June 2017 special meeting, that vote violated the Operating Agreement's conflict-of-interest and fairness provision because members with a conflict of interest, *i.e.*, those acquiring additional membership interests under the plan, participated in the vote. Specifically, section 6.11 of the Operating Agreement, entitled "Transactions with Members" states as follows:

> "The Member does not violate Member's duty or obligation under the Act or under this Agreement merely because Member's conduct furthers Member's own interest. Accordingly, to the extent permitted by applicable law and subject to the provisions of this Agreement, it is acknowledged and agreed that any Member and Member's respective Affiliates may purchase property from, sell property to, enter into a material contract with, or otherwise conduct business with the Company; provided that the terms and conditions of any such transaction are (1) fair and commercially reasonable, (2) no less favorable to the Company than if the transaction had been made with an independent third party, (3) in furtherance of the Company's purpose, and (4) fully disclosed to and approved by the Members *with the Member with the*

- 21 -

*conflict of interest excluded from any discussion of or vote on the transaction*."

(Emphasis added.)

¶ 53 In response to plaintiff's recapitalization argument, defendants do not dispute that there were "deficiencies" in the June 2017 vote. Instead, they argue no vote was required because, under section 8.2, managers were clearly permitted to issue additional membership units and plaintiff fails to "explain at what point additional membership units cause a 'recapitalization' ***." They reference the Black's Law Dictionary definition of the term, which provides that recapitalization is "[a]n adjustment or recasting of a corporation's capital structure—that is, its stocks, bonds, or other securities—through amendment of the articles of incorporation or merger with a parent or subsidiary." Black's Law Dictionary (11th ed. 2019). However, defendants fail to note that Black's Law Dictionary further describes a recapitalization as including a "leveraged recapitalization," which occurs when "the corporation *substitutes debt for equity* in the capital structure ***." (Emphasis added.) *Id.* In our view, it is not the issuance of additional membership units that warrants a finding of recapitalization but the fact that the June 2017 plan substituted IESO's debt for equity in the company.

¶ 54 Thus, as argued by plaintiff, because the June 2017 debt-to-equity conversion fits within the definition of a recapitalization, under the plain language of the Operating Agreement, approval of IESO members "owning [75%] of all the Members Voting Interest" was required pursuant to section 4.4(G). Moreover, there is no dispute on appeal that the June 2017 vote that did occur was deficient in that it impermissibly included members with a conflict of interest in violation of section 6.11.

¶ 55 Given the plain and unambiguous language of the Operating Agreement, we agree

with plaintiff that defendants were prohibited from treating IESO member loans as capital contributions or from issuing membership units in exchange for the release of member loan debt. Additionally, the June 2017 debt-to-equity conversion amounted to a recapitalization plan, for which proper approval was not obtained. Accordingly, the trial court erred in finding the challenged June 2017 debt-to-equity conversions were authorized by IESO's Operating Agreement and granting summary judgment in defendants' favor on that basis in connection with counts I, II, III, and V.

¶ 56　　　　Plaintiff asks this court to grant partial summary judgment in his favor with respect to counts II and IV on the basis that there is no genuine issue of material fact regarding the impropriety of defendants' treatment of $13,793,585 in member loans as capital contributions. However, we decline plaintiff's request on the basis that both counts involve other disputed issues of material fact.

¶ 57　　　　　　　　　　　D. Count I—Request for Injunctive Relief

¶ 58　　　　As discussed, in count I of his second amended complaint, plaintiff brought a claim for injunctive relief. Specifically, he sought an order enjoining (1) the Sea Hunter merger transaction and "or other transaction seeking to transfer IESO's business, assets or membership interests to a third party"; (2) the debt-to-equity conversion or "maintaining percentages of ownership on the books and records of IESO reflecting the [d]ilution percentages or any percentages of ownership other than *** where [plaintiff] owns 13.9% of all equity or value of IESO"; (3) business or transactions based upon the alleged improper dilution of membership interests; (4) business or transactions of IESO "which fails to provide Notice to [plaintiff] or any other rights accorded a Member of IESO"; (5) use of an Operating Agreement in any form other

than prior to November 2018; and (6) any transaction unless and until IESO managers provide access and copies of records as required by the Act.

¶ 59    In granting summary judgment in defendants' favor, the trial court determined additional bases—aside from its finding that the debt-to-equity conversion was authorized by the Operating Agreement—existed for granting defendants summary judgment in connection with count I. Specifically, the record reflects the court determined requests to enjoin the Sea Hunter merger transaction were moot because it had been terminated prior to the filing of plaintiff's complaint and was "of no further force and effect." The court also determined that plaintiff improperly sought "unspecified" or "generic" injunctive relief for conduct that "might occur in the future," resulting in claims that were "overbroad and vague" as a matter of law. Finally, it found plaintiff improperly sought relief for claims upon which "redress [could] be had at law."

¶ 60    On appeal, plaintiff argues the trial court erred in finding his claims in count I were "moot," noting the allegations in his complaint included claims that another transaction based on diluted ownership percentages was likely. Specifically, he points to the following allegations:

"243. Based upon statements made by St. Germain, the IESO Defendants remain in discussions with Sea Hunter about completing the previously abandoned 'merger' transaction.

244. Based upon statements made by counsel for the Sea Hunter entities, such entities remain interested in acquiring the assets of IESO and would not agree to include or involve [plaintiff] in any such discussions."

¶ 61    First, "[a]n issue is moot if no actual controversy exists or where events occur which make it impossible for the court to grant effectual relief." *Dixon v. Chicago & North Western*

- 24 -

*Transportation Co.*, 151 Ill. 2d 108, 116, 601 N.E.2d 704, 708 (1992). Here, plaintiff's request to stop the Sea Hunter merger transaction was clearly moot as that transaction had been abandoned in November 2018, prior to the filing of plaintiff's second amended complaint. Accordingly, it was impossible for the trial court to grant effectual relief as to that claim under count I because there was no longer a transaction to enjoin.

¶ 62      Second, to the extent plaintiff sought to enjoin "any transaction" with Sea Hunter or some other entity, we find he cannot, as a matter of law, state a claim for injunctive relief. See *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163, 862 N.E.2d 985, 991 (2007) ("If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper.").

¶ 63      To obtain injunctive relief, a plaintiff must show "(1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists." (Internal quotation marks omitted.) *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 44, 50 N.E.3d 643. Further, "the right to injunctive relief rests on actual or presently threatened interference with another's rights." *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Railway. Co.*, 195 Ill. 2d 356, 371, 748 N.E.2d 153, 162, (2001). "Generally, the damage sought to be enjoined must be likely and not merely possible." *Id.*

> " 'The act to be enjoined should be actually threatened and must be such as might be expected with reasonable certainty if not enjoined. Thus an injunction will not be granted on a mere suspicion of an intended wrong, or upon speculation or conjecture, or because there is a mere possibility or apprehension on the part of the plaintiff that some illegal act will be done.' " *Id.* at 371-72 (quoting 21A Ill. L. and

- 25 -

Prac. *Injunctions* § 16 (1977)).

¶ 64    Here, plaintiff's claims as to other possible transactions were based upon suspicions of possible future transactions and not an actual or presently threatened interference. Accordingly, they do not show a clear and ascertainable right in need of protection or the likelihood of irreparable harm. As a matter of law, plaintiff was not entitled to injunctive relief on such claims.

¶ 65                                E. Count IV—Rescission

¶ 66    In count IV of his second amended complaint, plaintiff challenged both the Sea Hunter merger transaction and 2015 convertible note as violative of IESO's Operating Agreement. He sought relief, including judgments in his favor rescinding both (1) the Sea Hunter merger transaction "or any such similar undisclosed transaction" as null and void and (2) the 2015 convertible note "and any other convertible debt instruments" as null and void "or such portions of such instruments as provide any right to convert into equity of IESO by any party." The record reflects the trial court granted summary judgment in defendants' favor as to count IV on the basis that plaintiff's claims were moot.

¶ 67    "Rescission of a contract is an equitable remedy." *CC Disposal, Inc. v. Veolia ES Valley View Landfill, Inc.*, 406 Ill. App. 3d 783, 788, 952 N.E.2d 14, 18 (2010). It involves "the cancelling of a contract so as to restore the parties to their initial status." (Internal quotation marks omitted.) *23-25 Building Partnership v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 757, 886 N.E.2d 1156, 1163 (2008). Additionally, as stated, "[a]n issue is moot if no actual controversy exists or where events occur which make it impossible for the court to grant effectual relief." *Dixon*, 151 Ill. 2d at 116.

¶ 68    Here, to the extent plaintiff sought to rescind the Sea Hunter merger transaction or

a "similar undisclosed transaction," there was nothing to rescind. The merger transaction with Sea Hunter was never completed and had been abandoned, and nothing in the record established the existence of another completed "similar" transaction. Accordingly, no actual controversy existed, and plaintiff could not have obtained any effectual relief.

¶ 69    Regarding the 2015 convertible note, plaintiff alleged in his second amended complaint that IESO defendants entered into the note with St. Germain in the principal amount of $1,831,679. He also asserted they agreed that the principal amount of the note was "convertible at the option of the holder into equity in the Company at a conversion price equal to the unit price paid by new investors." According to plaintiff, IESO borrowed additional money that ultimately increased the principal balance of the note to $5,664,679. He alleged that entire amount, along with related accrued interest, was converted to equity in IESO in June 2017 in violation of section 4.14 of the Operating Agreement.

¶ 70    In seeking summary judgment as to count IV, defendants maintained that the challenged debt-to-equity conversion that occurred after June 2017 were not "based upon any right the creditor members had to convert their debt to an equity interest, but solely as the exercise of the Managers' independent right to secure the release of all of IESO's respective indebtedness to them as capital contributions to restore IESO to solvency." They further asserted that the note did not give St. Germain the right to convert debt into equity, arguing as follows:

> "The simple, undisputed, and dispositive fact relative to Count IV of the Plaintiff's Complaint is that the intent of the Demand Note Agreement, pursuant to which $5,664,679 of loans were made by the Defendant St. Germain to IESO was not to grant the Defendant St. Germain any right to convert the loan balances to

- 27 -

membership units, nor did the terms of the debentures afford such a right to the holders of said debentures with regard to IESO's debenture indebtedness. The Demand loans and debentures only afforded their respective creditors a right to repayment by IESO of its indebtedness to them, with the concomitant cause of action against IESO upon IESO's default in the repayment of the underlying indebtedness, the right to reduce that indebtedness to a judgment against IESO, and ultimately cause the liquidation of IESO's assets to satisfy that judgment."

¶ 71 In his response to defendants' motions for summary judgment, plaintiff reasserted allegations that the 2015 convertible note was "convertible at the option of the holder into equity." Further, he clarified that he was requesting "only that the Court rescind any terms of debt instruments that provide[d] for conversion, not the loans themselves." When presenting argument to the court regarding the 2015 convertible note plaintiff made a statement that if defendants' counsel was "representing that these members who had made loans had no right contractually to convert their loans into equity then we'll take him at his word."

¶ 72 Ultimately, the trial court granted summary judgment in defendants' favor regarding plaintiff's convertible-note claim, finding plaintiff "defined the scope of the relief [he] sought" as to rescind only the terms of the debt agreements that provided for conversion and not the actual loans. It then noted defendants did not "maintain that a right to conversion provision was included in the debt instrument" and concluded plaintiff's claim regarding the 2015 convertible note was, therefore, moot.

¶ 73 On appeal, plaintiff argues it was error for the trial court to rely on defendants' unsupported assertion that the challenged note did not contain a conversion provision and that a

- 28 -

genuine issue of material fact exists regarding the provisions of the 2015 convertible note. Defendants respond, arguing the court did not err given that plaintiff conceded during his oral argument on the issue that he was not disputing defendants' claim of no conversion provision in the note.

¶ 74        Here, the trial court's summary judgment order does not reflect that it was relying on any concession by plaintiff at oral argument that the challenged note did not contain a conversion provision. Further, when taken in context, we find the statements by plaintiff's counsel at the summary judgment hearing do not amount to a concession regarding the actual contents of the challenged note but was, instead, an allowance for the sake of argument. Specifically, the record reflects counsel asserted as follows:

> "And [defense] counsel just moments, half an hour ago, said that none of the agreements were recourse. They weren't convertible. He said that. Now, one of the agreements is referred to in their financial statement as a convertible note, the 2015 convertible note, which was never produced. So I don't know whether that— normally a convertible note would be convertible debt to something but we don't have the terms. But if counsel is representing that these members who had made loans had no right contractually to convert their loans into equity then we'll take him at his word. So now you have an Operating Agreement that doesn't allow the loans to be a capital contribution, you have an admission from counsel that none of the loans were convertible, you have a document that says they're not recourse. The first 8 million of this is not even recourse. There's no way for the lender or member who made the loan to even put the company in bankruptcy ***. All they can do is

- 29 -

hope that they get repaid out of the net cash flow of the company."

¶ 75        Given these circumstances, we agree with plaintiff that a genuine issue of material fact exists regarding the content of the 2015 convertible note and its potential ramifications. Accordingly, we find the trial court erred in finding plaintiff's allegations as they relate to the note were moot and granting summary judgment in defendants' favor on that basis.

¶ 76                    F. Count V—Breach of Operating Agreement

¶ 77        In count V of his second amended complaint, plaintiff alleged breaches of IESO's Operating Agreement based upon IESO members' approval of the allegedly "unlawful transactions." Regarding that count, the trial court determined an additional basis for granting summary judgment in defendants' favor—aside from its finding that the debt-to-equity conversion was authorized by the Operating Agreement—was that plaintiff failed to allege facts to support the element of damages as to the terminated Sea Hunter merger transaction. It found the only damages alleged by plaintiff "were attorneys' fees incurred *** to 'oppose the proposed Sea Hunter transaction' based upon the alleged lack of the Managers' authority to execute the Merger Agreement." However, the court concluded that plaintiff's attorney fees could not be said to have been "proximately caused by the execution of the Merger Agreement" when there was no "notification to *** Sea Hunter" of plaintiff's objections to the managers' authority to execute that agreement.

¶ 78        On appeal, plaintiff asserts it is "unclear how or why notice to Sea Hunter" was relevant to his claim based upon IESO's approving members' breach of the Operating Agreement and that, in any event, the trial court was incorrect in finding he did not notify Sea Hunter of his objections to the proposed merger transaction. Plaintiff points to an exhibit to his second amended

complaint, which he argues shows notice to Sea Hunter of his objections to any transaction between IESO and Sea Hunter and creates a genuine issue of material fact regarding the damages issue.

¶ 79　　　　Initially, as defendants point out, plaintiff presented no reasoned argument to challenge the trial court's proximate cause analysis. Accordingly, we find he has forfeited such a challenge for purposes of review. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (providing the "Argument" section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 80　　　　However, as indicated, plaintiff cites to Exhibit P of his second amended complaint, which indicates he sent correspondence to various individuals in March 2018, including someone representing Sea Hunter, alleging both the June 2017 debt-to-equity conversion and the proposed March 2018 Sea Hunter transaction were improper and stating his objection "to any transactions involving any membership interests unless and until the proper distribution of membership ownership interests is restored." Additionally, contrary to defendants' assertions on appeal, plaintiff did present argument to the trial court at the summary judgment hearing that he notified Sea Hunter of his objections. Specifically, plaintiff's counsel argued as follows:

> "But the reason why [the merger agreement is] a scheme, Your Honor, you'll also remember that the first time they tried to do this transaction in April we complained to Sea Hunter and sent Exhibit P to the folks at Sea Hunter explaining to them that they had the capitalization of the company wrong and they could not sell all the

- 31 -

assets of IESO."

¶ 81 Accordingly, we agree with plaintiff's contention on appeal that "the existence of Exhibit P creates a fact issue concerning the notification of Sea Hunter." As a result, the trial court erred in granting summary judgment in defendants' favor as to count V on the basis of plaintiff's failure to allege facts to support the element of damages.

¶ 82         III. CONCLUSION

¶ 83 For the reasons stated, we affirm the trial court's rulings on defendants' motions to compel discovery and strike defendants' motions for summary judgment as unsupported. Additionally, we affirm the court's grant of summary judgment in defendants' favor as to count I of plaintiff's second amended complaint and as to count IV of that complaint to the extent plaintiff sought rescission of the uncompleted Sea Hunter merger transaction. We otherwise reverse the court's judgment, granting summary judgment in defendants' favor, as to counts II through V of that complaint and remand for further proceedings.

¶ 84 Affirmed in part and reversed in part; cause remanded.